The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning, ladies and gentlemen. We have four cases on the calendar this morning. Three patent cases, two of them from the PTAB and one from the Commission, and a Veterans case. The first case is Bracco Diagnostics v. ITC, 20-1358. Mr. Davis. Good morning, Your Honor. May it please the Court, this is Mark Davis for Appellant Bracco Diagnostics. Absent questions from the panel, I will focus on the issues relating to the first-door limitation and to the onboarding of the dose calibrator and rely on the briefs for the other issues. Turning first to the first-door limitation, as shown on pages 40 and 41 of Bracco's initial brief, Claim 1 of the 869 patent requires, among other things, a first-door that is not only accessible via an opening in the outer shell, but which is also configured to provide access to the first shielding compartment and to close over the first opening of that shielding compartment. Mr. Davis, aren't all the claim limitations in CLINE except the onboard calibrator? And Tait provides that? So, no, Your Honor. First of all, the first door is not disclosed in CLINE because the generator access lid is not accessible via what the Commission found to be the opening in the outer shell. If you turn to page 47 of the initial brief of Bracco, you can see the picture of CLINE showing the location where the Commission found the generator access lid to be. As you can see, it's on the top of the cart, on the outside of the cart on the top. But if you look at appendix page 6276, you'll see what the Commission found to be the opening in the outer shell. And that opening is not on the top of the cart. It's on the side of the cart. And accordingly, one would not reach through an opening in the side of the cart to access a door that resides on the outside of the top of the cart. And if one were to reach up to do so, one could not then obtain access to the shielding compartment that is the generator compartment. Also, the first generator access lid doesn't close over the opening to the shielding compartment. The Commission found instead that the door, the generator access lid, closed over the other opening, the opening in the top of the shell. Counsel, can I ask? This is Judge O'Malley. I'm sorry. If we find that the generator access lid, as you argue, does not meet the first door limitation, would we have to remand? Or is it possible for us to say that in light of other testimony, that that error would be harmless? So actually, Your Honor, I would submit that it's certainly not harmless error because the Commission erred in finding an element of the claim satisfied when it was not. And the Commission did not make a finding in the alternative that it would have been obvious to add a door having the features that are required. That was the theory that was argued by Jubilant and by the staff that was fully briefed. Counsel, this is Judge Moore. I thought I remembered the Board expressly finding in light of Stone that such doors, Stone's testimony, that such doors were, in fact, obvious. So if you look at Stone's testimony, he didn't actually, well, he said that doors are common. But that falls far short of the required analysis for duvasive. First of all, it only applies to the door. There was no analysis with regard to the door being accessible via the opening in the outer shell, or that the door was positioned such that it would provide access to the door. Given the failure to address all of those additional requirements of the claim limitation, the Commission failed as a matter of law, and Dr. Stone's obviousness analysis likewise fails as a matter of law. This only applies to the 869 patent, right? Correct. Okay. Let's turn now to the dose calibrator and the motivations that the Commission and the Judge found with regard to moving the dose calibrator onto the cart. If you look, the motivations that the Commission relied on are set forth at appendix page 96. And bear in mind, Your Honors, remember that both experts testified at trial that Klein itself does not teach any motivation to alter or combine it with other art. Despite that, the Judge found, based on his own analysis that was not previously made known to the parties, that Klein did indeed provide three motivations. But the motivations that the Judge found and that the Commission relied upon were based on a misunderstanding of how the dose calibrator is used in Klein. The dose calibrator for Klein is only used once a day as  is not used to monitor the dose provided to patients. Accordingly, if you look at the motivations that the Judge pointed to, the ability to move the cart around during patient treatment, that desire for mobility actually teaches away from putting the dose calibrator on the cart, because when you do that, you need to shield everything. And it adds considerable weight to the cart, making it less mobile. Judge Moore, I understand that on these points you've raised an APA challenge. Is there evidence that you would have liked to have introduced on these points that you didn't have the opportunity to? Yes, Your Honor. There is evidence we could have pointed out. We could have clarified the Judge's and the Commission's error with regard to the misunderstanding of the purported motivations of Klein. We could have submitted expert testimony with regard to the passages of Klein that were cited by the Judge and relied upon by the Commission that would have shown that these related to issues that would not have motivated one to place the dose calibrator on the cart, but rather would have motivated one to keep it off the cart. We have in the appendices the briefs that were submitted before the Commission where the staff raises the issue of Klein alone. Was that ever raised prior to the ALJ's initial decision? There needs to be a distinction in between Klein alone and the motivation to alter Klein. Klein alone was briefly raised by the staff, but the staff never pointed to anything in Klein that would motivate one to alter Klein. Counsel, you're not answering my question. My question was I understand that the staff may have pointed to Klein alone in its brief before the Commissioner, but I'm asking you now to focus on the timeframe prior to the initial decision by the ALJ, which in the appendices we have is the first time there's ever been a Klein alone rejection. Was that argument made either by the staff or by the petitioner prior to the ALJ's decision? The staff made a conclusory argument that it would also work with Klein alone. When? When did they make that argument? In the post-hearing briefs before the ALJ, but not in the pre-hearing briefs. Sorry, Your Honor. With regard to operational simplicity, which the ALJ also found, you'll note in the ID, the initial determination, the ALJ says that that would avoid having to use a dose calibrator. But again, you don't need to do that because the dose calibrator is only used once a day. So that operational simplicity doesn't apply. Now, Dr. Stone did simply opine without any analysis that it would only be natural when one was commercializing the cart to place the dose calibrator on the cart. But that goes against the compelling real-world evidence. Your Honor, I see that I'm into my rebuttal. Counselor, you can continue or save your time, whichever you wish. I'll just finish this point, Your Honor. So the record shows that for 30 years, the only commercially available product used a dose calibrator that was not on the mobile cart. And even today, the most popular commercial product still uses a dose calibrator that was not on the cart. Likewise, when the University of Ottawa, where Klein was, was giving advice to Jubilant with regard to how to commercialize the University of Ottawa device, they did not suggest putting the dose calibrator on the cart. They simply said, use different tubing so that you can hook up the system to any of the commercially available dose calibrators. And as the Commission found, it was only after Jubilant learned of what BRCA was doing, remember the secondary consideration of copying, that they actually placed the dose calibrator on the cart. Thank you, Your Honor. I'd like to save the rest for rebuttal. We will do that. Ms. Morad for the Commission. Good morning. May it please the Court, the Commission correctly determined that Jubilant and the staff established by clear and convincing evidence that the asserted claims are obvious over Klein alone, and in combination with other prior art, including Tate. Substantial evidence supports the Commission's findings that the prior art teaches or suggests every disputed and undisputed limitation, and that there was motivation to combine the references. BRAC will impermissibly ask this Court to reweigh the evidence of records and adopt BRAC's views as to that record. Ms. Morad, before you move into the merits of the obviousness arguments, I'd like you to start by addressing their argument that the Commission's decision on Klein alone violated the ACA. That is incorrect, Your Honor. First of all, I'd like to correct some statements made by BRAC's counsel about whether the argument was raised by the staff. The argument was absolutely raised by the staff before the ALJ and before the ALJ issued his initial determination. It was raised in the staff's post-hearing brief. This is the first time I hear an argument that it was not raised in the pre-hearing brief. It is not allowed for parties to raise arguments for the first time in the post-hearing brief, and if that happened, BRAC should have pointed that to the judge. So the staff, before the ALJ issued his ID, argued that Klein alone rendered the asserted claims obvious. And the staff did that not only in a conclusory fashion, as BRAC's counsel is arguing, but he did it in the summary of analysis, but also in the claim element-by-element analysis. And for that, I will point you to... Appendix 6478 and 64... Oh, I'm sorry. Just a second. Yes. Appendix 6478, 6479, Appendix 6474, and Appendix 6475, Your Honor. I'm sorry. Which page in particular represents the staff raising this argument? Hold on, Your Honor. Give me just one second. Just want to make sure. Okay. Appendix 6478, 6479. Okay. So 6478 is the staff's post-hearing brief. Is that correct? That's correct. That is correct, Your Honor. That's the claim element-by-element analysis. Okay. For the shielded well on board the cart. And it starts at the bottom of 6478. While the client system has an off-board dose calibrator, it was obvious to install the dose calibrator on any platform of the cart, along with the generator shielding compartment. They cite Dr. Stone's testimony. And then the last sentence after the paragraph that follows the first picture on Appendix 6479, they say the integrated cart having the on-board dose calibrator is also topped by Tait and Intego. So the combination with Tait was an additional argument that the staff relied on. But Klein alone was properly raised by the staff here in the claim element-by-element analysis, but also on Appendix 6474 in the summary of the analysis. Again, arguments about Klein alone. And Appendix 6464, the initial argument, all the asserted claims are invalid as obvious in view of the Klein alone or in combination with other prior arguments. Now where on 6474 does the staff raise this argument? So again, on Appendix 6474, the client system includes each of these components, but places them off the cart. That's after subheading 2. And the last sentence, the evidence demonstrates it would be obvious that the dose calibrator of the client system could be moved on to the cart. So here, it's again discussing Klein alone. And that's why- I have a-this is just more-I have just an educational question. Just out of curiosity, what is the staff's role in this dispute? How does the staff function in a dispute between two parties, between the ITC? The staff is an independent party before the commission, and the commission's rules, 19 CFR 210.3, define the staff as a party. And the staff's role is to represent the public interest. In the Lanham case, which we cited in our brief, the court recognized the staff as a party, and the staff can raise invalidity challenges in investigations before the commission. So it is understood or accepted that the staff can raise entirely different or new arguments that weren't in the petition? Is that correct? The staff did not raise an argument that wasn't in the petition. No, counsel, the petition never said Klein alone could result in obviousness. So the staff did raise an argument that was a new issue that wasn't in the petition. I'm sorry, which petition are you discussing? Are you discussing Bradford's petition to the commission, or the staff's petition to the commission? I'm sorry, counsel. I meant before the ALJ. So I shouldn't have used the word petition. So the staff can raise new arguments for invalidity before the ALJ that were not raised by the opposing party, like Jubilant? Well, the staff is a party that participates from the beginning of the investigation, and the staff represents the public interest. The staff can raise its own issues. The staff properly can raise invalidity issues, and they did so properly. But they never did so before the hearing, though, did they, counsel? That is incorrect, Your Honor. This is the first time that I hear Bradford saying that they didn't raise it before the hearing. There is no evidence of that in the record. If they raised it in the post-hearing brief, for sure they should have raised it in the pre-hearing brief as well, because the commission rules do not allow arguments raised for the first time in the post-hearing brief. And there was no argument by Bradford before the ALJ or before the commission that there was an argument that was new raised in the post-hearing brief that was not raised in the pre-hearing brief. Okay, so wait. First, I have two questions before you sit down. So you're saying it was raised in the pre-hearing brief, and yet the only thing you've pointed to is the post-hearing brief? That's correct, Your Honor. Then why is that not in the joint appendix? The argument that BRACO made was that the ALJ did not raise the argument before the ALJ. And we pointed to evidence that the staff did. Right. Again, wait. Counsel, can you just answer my question? The only thing you've pointed us to is the post-hearing brief. Are you saying that there is another brief, pre-hearing, where the staff raises this? I'm saying that because BRACO did not say... Okay, it's a yes or no question. Yes or no? Your Honor, the pre-hearing brief is not part of this appendix. I agree with you. But I do not... So it's not in the pre-hearing... Can you just answer my question? Is it in the pre-hearing brief or not? I believe it is in the pre-hearing brief. That's correct, Your Honor. My second question, and I think, again, this could be a yes or no answer, but the pages that you cited us to at JA-6475 and the other pages you cited us to never mentioned the various motivations to move the system onto the cart that the ALJ relied upon. Isn't that right? This is in part correct and in part incorrect. Well, the only motivation that the staff mentions is that BRACO's patent got the inventive idea from some users of its own system. But those aren't the motivations that the ALJ relied on. At appendix 6479, Your Honor, the staff states that Dr. Stone noted that if someone were looking to commercialize a version of the client system, it only makes sense to place the system components on a single unit or single cart. Citing Stone's testimony, I believe this is appendix 1165 and 1166. Okay, so only makes sense is an expert opinion? Again, those aren't the motivations, the specific motivations that the ALJ relied on, is it? Well, this is the second one, the operational simplicity, and he relied on the same testimony. And then Jubilant also raised the argument that having to roll the cart back to the hot lab every morning was inconvenient. So the mobility argument was also raised by Jubilant. Can I ask one additional question, please? This is Judge Moore. My question is 554C, which is the provision they cite in the blue brief and in the gray brief, requires not just notice and an opportunity to be heard, namely briefing, but it requires an opportunity to present facts. So can you please respond to whether BRACO had an opportunity to submit evidence on these particular motivations that the ALJ found? And if so, when? What is the time after which the evidentiary record is closed? Before the commission, they have the opportunity to file a petition raising all the objections they have to the ALJ's initial determination. And so in their petition, they could have and should have told the commission that they needed the record to be reopened, or they needed the commission to- I just want to be clear. Let me just be clear so I understand factually. Is it true that they're not permitted to submit new evidence before the commission? They are not permitted to submit new evidence without asking for permission to ask such evidence. But they could have- What rule allows them to ask-gives them the opportunity to reopen the record? Your Honor, I'm not aware of any particular rule allowing them to ask for permission to reopen the record. But the parties, they do do that in practice before the commission filing motions for leave. And also under the APA, the commission- the APA vests the commission with the authority to hear evidence. If the parties ask to reopen the record, they could do that even before the commission, or they could ask for remand to the ALJ. Just to be clear, Bracco asserts that they are not permitted to submit new evidence before the commission. Is that correct? Is the record closed once it leaves the ALJ? It is true that the record-that they are not permitted to on their own submit additional evidence, but they can ask the commission for leave to do that. Respectfully, that's like asking for a motion for reconsideration. And you know what? We never fault people who weren't given an opportunity to present evidence because they didn't ask for reconsideration or a new opportunity to do so. If the commission closes the record and then makes a decision on a basis that wasn't something they had the opportunity to submit evidence on, they're allowed to appeal it to us. They don't have to ask for reconsideration before the agency. I mean, do you see some problem with that? Is there some law that you could point me to that would suggest that my understanding of the law is incorrect? Well, under the APA, 5 U.S.C. 557 B, the APA vests the commission with the authority to hear evidence as if it was presented for the first time. They can do that. I don't believe it's a motion for reconsideration. They have not asked the commission to reopen the record. They have not even identified any additional evidence that they would have wanted the commission to consider. And also, I mean, the commission made supplemental findings based on the combination that they had noticed and an opportunity to address the combination of the two. I don't understand the logistics, and it's nowhere in this record. At what point before the ALJ is the record considered closed? Is the record considered closed as of the day of the hearing, or when is the record, the proceedings before the ALJ, when is the record closed such that you don't, as a matter of right, have the ability to submit additional evidence? I believe that before the ALJ, I mean, as long as it's before the ALJ and before it goes to the commission, I believe under the rules, they can ask the ALJ to reopen the record. I'm not asking you if they can ask to reopen. I'm asking when it closes. You don't need to reopen something until it closes. So when does it close? Before the commission, I believe that if they ask for permission, I suppose there is like a brief case in every court in the country, discovery closes as of a certain date. Within the commission, there must be a procedure. I don't know why you're hiding it from me. There must be a procedure. When does the record close before the ALJ? Is it prior to the hearing, at the time of the hearing, after the post-hearing brief? When does the record close so that you can't just submit additional new evidence? I apologize. I thought you were asking me to point to a rule. But in terms of when the record close, I believe this is the procedural schedule that is presented to the ALJ and adopted by the ALJ. That would have a date for the close of discovery and a date for the close of expert discovery. So that would be before the hearing. I don't know when exactly, whether it's before they submit pre-hearing briefs but I believe it's before the hearing, before the ALJ and certainly before the ALJ issues the initial determination. My understanding, Counsel, that in this case, the record before the ALJ was required to be complete at the time of the pre-hearing briefs, meaning no party was allowed to submit additional evidence after the pre-hearing briefs were filed. Is that correct? Absolutely, without leave, without asking for leave yet. Counsel, I think we have your argument. We'll now hear from Mr. Hales and we'll give him seven minutes. Can I say just one short thing about the first door? Very short. Because I just want to say that the argument that the first door was not accessible via the opening through the exterior shell, that was not an argument that BRACO raised in their opening brief. They made a different argument at page 43 of their brief that the first door is not accessible through the opening on the top surface of the cart, not through the front surface of the cart. Additionally, I want to point to appendix 33 where the Commission expressly found that doors are conventional and common and cited expert testimony in that regard. So there was an alternative finding that doors are obvious. Thank you, Your Honor. Thank you, Counsel. Mr. Hales. Yes, thank you, Your Honor. Good morning. I may have pleased the court. Again, Bob Hales representing the Jubilant Companies. I guess if there's one takeaway that I would ask you to consider coming from today's proceedings is to please compare the Commission opinion and the breadth of its analysis and the number of different pieces of evidence that it cites to support its holdings to BRACO's briefs. You'll see there are large portions of the Commission opinion that are untouched by BRACO's appellate briefing. The two easiest ones to see are, for example, the Commission's KSR analysis. And with respect to the first shielding component referenced in appendix 20 to 23, there were two bases and BRACO failed to appeal one of them, to challenge one of them. So there's a large body of evidence that the Commission made its findings and based its findings on that are largely untouched by BRACO's appeal. And I think there is a possibility of sort of a misunderstanding or a misconception if one were to focus solely on the pieces of evidence that BRACO challenges. I'm happy to discuss any of the elements that interest you. I was going to start with these first doors because Mr. Davis made an argument against them. This is an issue where there's actually different approaches taken by the staff and taken by jubilant when presenting that claim element and mapping it on to the evidence of record. The staff had taken the position that this generator access lid efficiently teaches a door and closes over the shielding compartments as required. Viewing it from a perspective that closing over doesn't really require the shielding compartment to be enclosed, right? Viewing it from a perspective that the generator access lid does not have to make a segmented, completely enclosed generator. The evidence that we presented and the argument that we presented was that doors are conventional and common in the art and it would have been obvious to place a door directly on the shielding that is provided by the client system, the lead rings that he calls the shielding, the generator shield. As to the staff argument, you would concede that that's problematic since Dr. Stone actually said that . It wasn't the mapping that Dr. Stone used. When Dr. Stone was asked to compare it against the claim elements, he was not testifying in that manner. That's correct. He conceded, didn't he, at JA 1211 and 12 that the client doesn't actually disclose the first door limitation, right? That's right. That's actually right. He said that. That's right. Then he had a statement that doors are conventional and common. They're everywhere that he had seen in his experience working with these radioactive materials. He's a guy with, I think, 15 years or so of experience working with radioactive materials. Did he ever take the next step to say that doors are common and doors that are shaped in the way that the first door limitation is, that that would be something that one of skill in the art would necessarily do? I mean, all I got from him was that general doors are common. It seems like there should have been another step. It was. It was discussed in context with the tape reference showing how pervasive they are. Now I'm going to try to find it in our brief. He did explain that. He explained, and this is on page 43 of our brief, that these are taught throughout the body of art that he was relying on and that these are standard and these are things that people would do. Again, when when taking this university card, right, that's something that's made by a master's student and turning it into a commercialized product. And so I think he did testify to that. In our view, our read of review of the commission's opinion, the commission was adopting both of those arguments. There's a statement. They rely on Dr. Stone at Appendix 31. And that's in context with this generator access theory that staff had presented. And then the furthermore statement that's on Appendix 33 is, in our view, the commission agreeing with our opinion that this is this is just natural stuff that people would would provide in these kinds of systems. He he explained it's elsewhere. It's not cited by the committee. The in the commission opinion, he explained that the reason that they have these upward facing openings is so that, you know, when the thing is opened, that radiation is progresses upward and doesn't accidentally expose people who are approaching it from from lateral sides. And then, of course, it's it's obvious to put a door on it to make sure that it's completely enclosed and to even enhance further the safety aspects of these kinds. So basically, what you're arguing is that it was probably error for them to adopt the first position, but you think the error is harmless because they also made this alternative finding. There are there are these two alternative findings. And would you like to have the second one best? That's absolutely right. So so it is in our view, it's it's this is these are factual findings that are made by the commission and they are supported by substantial evidence, not only by the commission, but also the the opinion of our expert, who is somebody who was identified. I think the line that the ADLJ used was that it was undisputed that he has experience taking prototype devices to market, commercializing medical devices and bringing them into commercial ready market ready states. So that's where we are on the first door. Counsel, this is Judge Moore. I'd like you to change turn to page 19 of your brief, please. At the bottom of your brief, you cite our Nike case and you claim that it stands for the proposition, I'm quoting from your brief on the very bottom of page 19, that even in inter partes review, the PTAB does not violate the APA by raising invalidity grounds not presented by the parties, so long as the grounds are based on record evidence and the parties had notice of those grounds and an opportunity to respond before the PTAB issues its final decision. Can you tell me where in the Nike case we held that? Because what you represent our holding of Nike to be would be completely the opposite of what it actually held and in fact would be in direct conflict with SAS as rendered by the Supreme Court and every post SAS decision. And Nike came after SAS, so it's not certainly not the case that Nike could have disregarded SAS and nor do I think it did. So I'm a little troubled that you would hold out to us that our ground, as long as there's notice and opportunity to be heard, even if it wasn't presented by the parties. I am struggling to get my hands on the case. Do you understand what the SAS decision held from the Supreme Court? Do you understand that it held that the PTAB is never permitted to go outside the boundaries of the petition and make a decision on a ground that wasn't argued for on the petition? I do. How could our Nike case coming after SAS say the opposite? I understand the concern and it's probably an overstatement. I think the idea was the notice and opportunity to be heard. It's actually a wrong statement. It's not an overstatement. It's the exact opposite of what the opinion actually holds. And just so you know, there's a tiny portion of Nike not actually on the pages you cite which says limited to motions to amend because they are not any longer claims that fall within the petition itself. The PTAB can go outside the boundaries. But it says that after it makes it clear that they can never do that in a normal IPR because of SAS because the Supreme Court said you can't do it in SAS. And then the case goes on again after the portion that you cite isn't what was the subject of the petition at all. The PTAB can go outside those boundaries. But I don't welcome this kind of sloppiness in briefs. I understand, Your Honor. And it will not happen again. I guess we were looking at it from an APA perspective, right? We're looking at it from a notice and opportunity to comment perspective. But the point is taken. The opinion in Nike, with these principles in mind, we conclude the board violated the APA's requirements, dot, dot, dot, dot. So the Nike case speaks directly to the APA as well. But go ahead. Please move on. So our point on the APA challenge was that these challenges that are being raised were being raised to the ALJ's findings that they did have an opportunity for to be heard on them. And the council doesn't being heard mean an opportunity to present evidence, especially on factual findings. Yes, I do. I agree with that. I think that in this case, though, Bracco agreed with many of the findings that were made, right, were acknowledged these things. Kline does tout mobility. They said that at 6755. I don't think that Bracco agreed with the three different motivations articulated in the ALJ. I agree with you that he did not agree with the application of them. But the acknowledgement that Kline is interested in mobility is a consideration, that Kline is interested in operational simplicity. Yes, but as Bracco argued to us, it believes that these ALJ findings, which really do kind of come out of the blue on motivation to modify Kline alone, are based on a misunderstanding. And they would have liked an opportunity to submit expert testimony to explain that. I understand that. They didn't proffer anything, right, until we get to the reply brief. But I do understand that point. I would agree with the commission opinion relied on, including, for example, Dr. Stone's testimony about taking things to market. Dr. Stone testified directly that a mobility issue is one that actually the commission sort of impliedly reversed the ALJ, because the commission opinion, if you read it, talks about the difficulty of moving carts back to stationary dose calibrators, which is what Dr. Stone testified to directly and was presented directly. So even if there were a problem with these instances of motivation provided by the ALJ, to which Bracco complains, there are other sources, again, that are untouched, largely, that the commission based its findings on. Thank you, counsel. Your time is up. And we'll hear from you again in the related subject matter in the next case. Mr. Davis, we'll give you your full five minutes back. Thank you, Your Honor. I would like to address first counsel's statement that the commission implicitly reversed the ALJ with regard to the free motivation ALJ found inclined. That is simply not true. If you look at appendix page 15 and 16, you will see where the commission says the FID also correctly finds that several design incentives would have motivated a person of ordinary skill in the art to move the dose calibrator onboard the cart, including mobility, operational simplicity, and minimizing radiation exposure to the operator. C, FID, sight inclined, et cetera, et cetera. There was no implicit reversal. There was an explicit adoption. Also, with regard to the passing reference regarding KSR, if you apply KSR here, it shows that there is no obviousness. Here, it's for at least three reasons. One is the unrebutted evidence that when it comes to these types of sensitive machines, there are no small changes. You can see that at 1440 and 1925. Likewise, Drubalin struggled for years to move the dose calibrator onboard the cart, as shown at 1597, 98, and 99. It did not perform the same function as the dose calibrator used by Klein. And it appears that the commission's reliance on Tait was a misunderstanding of this difference. So the commission cited KSR for the proposition that a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way using the technique is obvious, unless its actual application is beyond his or her skill. So Tait and Klein do not use dose calibrators in the same way. Tait uses a dose calibrator to measure the dose given to a patient. Klein already has a separate monitor that does that, that is on the cart. And there was no evidence submitted that the dose calibrator that KSR threw could even be used to measure the radiation dose given to a patient. And that's because rubidium has such a short half-life. Likewise, Tait does not even have a generator. So it uses a cyclotron, which is what Klein disparages and says is not as useful. So we cannot teach anything about testing for breakthrough and whether that should be done on board a mobile cart when the testing of the radioisotope that is used in Tait is done at the cyclotron off-site. Your Honor, turning now to whether we actually made the arguments with regard to the first door. I would point your attention to appendix page 6757 where we talk about the motivations identified by the judge never having been raised by Jubal and or the staff. And we repeat that on 56, 57, and 58 as we talk about the three different motivations. We raised the issue with regard to the prejudice that it was caused to us in our petition to the commission. The commission did not address those arguments that we made to it. Also, just informationally, the record in this case closed on the final day of hearing. And the judge closed on the final day of hearing. And we did not address those arguments that we made to it. Jubal and cites in its brief two rules that it said would have provided us an opportunity to submit additional evidence. Both do not apply. One is for the judge to be able to reopen the record before he issues the ID. We had no notice with regard to these motivations until after the hearing. I'm not saying you had to, but you certainly could have. Your Honor, what we did is we told, and as both Jubal and the commission acknowledge, we pointed out the prejudice that was caused to us. And what we were seeking to do, rather than reopen the record, because again, this is an injunctive proceeding where we need injunctive relief as soon as possible. We argued that it was error to rely on those new theories. And we were asking the commission to simply rely on the theories that were really raised. Now, when the commission decided that it wanted to go ahead, it would go ahead and rely on those new theories. Its rules specifically state that it can reopen the record. But all that we are required to do is to point out it was error to do so. That we did. Thank you, Counsel. We appreciate the arguments of all counsel in the cases submitted. Thank you, Your Honors.